Next page, Your Honor, Number 2110360, Board of Education of Marquardt School District No. 15 v. Regional Board of School Trustees of DuPage County, Mr. Kenneth Hathaway Arguing for Glenmarsh School District, Mr. Ciccio Vasquez Arguing for Marquardt School District, Mr. John Kenneth Arguing for the Regional Board of School Trustees, Mr. Francis Sirleck Arguing for 3-10, Mr. Christopher Stull I understand the attorneys have agreed on time allocation with respect to your arguments. Is that correct? That is correct, Your Honor. You may proceed. Good morning, Your Honors. May it please the Court, my name is Raspi Sirleck and I represent the epaulant Glenmarsh High School District No. 87. On my left is a Mr. Jack Cannon, who is counsel for the epaulant Marquardt School District No. 15. In terms of the presentation for our oral argument this morning, Mr. Cannon and I agreed to split our initial 15 minutes evenly and then we also reserve our 5 minutes for rebuttal after the epaulees have their opportunity for argument. I will be addressing the jurisdictional issues raised in our briefs and Mr. Cannon will be addressing the issue on whether the Regional Board erred in deciding that the petitioners met the legal requirements to support the granting of the detachment petition. Regarding the jurisdictional issues that the school districts raised, our position is twofold. First, the school districts were entitled to submit our petition to the State Superintendent of Education under Section 7-6, Subsection 1 of the Illinois School Code when the Regional Board failed to approve or deny the Committee of Tenants detachment petition within the 9 months after the Regional Board received the Committee of Tenants detachment petition. Second, the Regional Board lost subject matter jurisdiction to grant or deny the Committee of Tenants detachment petition when the school districts submitted their petition to the State Superintendent of Education. There is no dispute that the Regional Board failed to issue a decision within the 9 months after they received the Committee of Tenants petition. There is also no dispute that the school districts submitted their petition to the State Superintendent of Education to take over the proceedings after the Regional Board failed to issue a decision within the 9-month statutory period. There is also no dispute that the school code states that the Regional Board loses all jurisdiction over the Committee of Tenants petition upon the submission of a petition to the State Superintendent under Section 7-6, Subsection 1, Subsection Paragraph 1 of the Illinois School Code. Further, there is also no dispute that the school code states that all jurisdiction over the Committee of Tenants petition is transferred to and shall be assumed and exercised by the State Superintendent under Section 7-6, Subsection 1, Subparagraph 2 of the Illinois School Code. This language is mandatory. It's not discretionary. What is in dispute is whether the school districts are considered school boards under Section 7-6, Subsection 1 of the Illinois School Code. It is the position of the school districts that we are school boards who can and did file a timely petition with the State Superintendent of Education. The specific language at issue is the following language. It reads, the school boards were registered voters of the districts affected that submitted the petition. Specifically, it is the school district's position that the phrase, that submitted the petition, only applies to the registered voters. What does the word affected apply to? Who does that apply to? The districts affected refer to the school districts, but also the registered voters  So we have a word that applies to both of the first two, and then the next phrase only applies to the second of the first two. Well, I would beg to differ that the districts affected are the registered voters within the districts. And let me explain. Because this would also make sense that this would only apply to the registered voters, and the following is the reason. When under this detachment proceedings, the registered voters who actually live within the territory that is to be detached, they are the registered voters that must submit and sign the actual petition. So affected doesn't refer to them at all, because they're already affected because they're the registered voters of the district, correct? Well, they are the registered voters of the district, but what I'm saying is that, for example, if you leave off that submitted petition and just read registered voters of the district, that would allow or expand the registered voters from just the people that live in the territory to everybody, all the other registered voters who live in the school district, but are not within the territory. You would be expanding that party if it were to proceed at the state superintendent level when the petitioners are restricted at the regional board level to only the registered voters who live in the territory and submitted or signed a petition. Maybe you answered my question, maybe you didn't. Does affected refer to the school boards? It weren't affected. Does that also refer to the school boards? I mean, it certainly refers to the registered voters of the districts, as you've just indicated, because otherwise we'd be expanding it to other registered voters who might not be interested in this at all. So the question is, does affected also modify the school boards? We are saying no, Your Honor. So any school board in the state of Illinois could remove this petition? No, Your Honor, and I'll explain why. Because in the petition itself, when the registered voters are filing a petition, they will state that they are currently within the boundaries of, in this case, they were currently under the boundaries of the Glenburn High School District as well as the Marquette Elementary School District. And in that petition, they will say, from those school districts, we want to annex to the following school districts. So the petition itself will limit which school districts are the ones that are applicable or part of the proceeding. So just on the face of the petition, it would not allow for you to expand to all school districts. It would specify which school districts they will be detaching from and which school districts they will be annexing to. Are you reading something into that statute, then, that says that the school boards or the school districts named in the petition? Are you reading that into that statute that's not there? Well, Your Honor, it's at that point that you have to put this in context with the full article under the school code under detachment proceedings. In there, when you're first filing the petition, you're already specifying which of the school districts are involved under that petition. And those are the school districts that are the parties or potential parties to the detachment proceeding. So you wouldn't be expanding to all school districts. It would be limited to the school districts that are in the petition. But that would, of the districts affected, would apply to both the school boards and the registered voters, correct? Well, if you're going to... You can sort of expand that the regional voters of the districts affected are the ones that they are listing in their petition. And in that context, you would say yes, because the districts that are affected are the ones that are named in the petition. The 701A talks about when petitioned by the boards of each district affected. Now, that's not involved in this. It's not involved in this. It's with changing boundaries. But it uses very similar language talking about boards of a district affected. Why wouldn't that be read in a similar context in this statute? Because, Your Honor, in this case, because the districts affected are actually modifying or restricting the registered voters in this context. Because otherwise, if you don't allow them, if you don't modify the registered voters with the districts affected that submitted the petition, basically, you would allow any registered voter or any registered voter within any of the four school districts in our case. But yet, they wouldn't necessarily be any of the registered... They would actually not have to be a registered voter to live within the territory that needed to submit the petition. Let me ask you one other question for a very brief answer because your time is up. But this says school boards can remove it, right? Yes, we're saying school boards can. Okay. What board action? Was there board action in this case that removed this thing? Did your board sit and vote and vote to remove it? The school board voted to proceed with the detachment proceeding and authorized the superintendent to proceed with these proceedings and move next. So you're saying there was board action to remove it to the state superintendent? Not just the attorneys? No, that is correct. Your Honor, my time is up. Good morning. John Keon on behalf of District 15. May it please the Court. I'm going to talk briefly in the time we have left about the merits of the decision of the regional board. I'd like to start with a short overview of the standard review burden of proof issues. It's clear from the Carver decision in the Supreme Court and other cases that the burden of proof has always been on the petitioners in this case. It never shifts to the school districts. The standard has been fairly well established for these detachment annexation cases in a number of cases, starting with the Oakdale decision in the early 60s. And that test is the analysis of whether the overall benefit to the schools and the educational benefit to the students in the detachment area, whether that clearly outweighs, that's the phrase used, clearly outweighs detriment to the losing districts. Finally, in both the Oakdale and the Carver decisions, the Supreme Court made clear that a reviewing court has not only the authority but the duty to set aside any regional board decision which is unsupported by the record of the facts in the case. And this is regardless of whether the decision was to detach or not to detach. It's our belief that legal standards, as articulated in the long line of cases leading us to today, that this record simply does not support the order that was issued by the regional board, either under the specific statutory standards of 7.6i or, more importantly, under the benefit detriment test that has been applied in numerous cases, most recently by the Supreme Court in the Carver decision. Do you agree this is a clearly erroneous standard of review? Well, it's difficult because the cases, Your Honor, talk about clearly erroneous. Some talk about manifest weight of the evidence. And the others, primarily the Supreme Court cases I just mentioned, talk about the standard of unsupported in fact. Well, if it's unsupported in fact, it would be clearly erroneous. I think that's correct, Your Honor. I think that's correct. When you have a mixed flush of law and fact, then the standard is clearly erroneous. Yes. But the terminology that the Supreme Court has used at least twice in those cases is unsupported in fact and the duty of the appellate court to vacate a regional board decision that way. I admit there's a bit of confusion in terms of how these cases have been analyzed by the appellate courts and the Supreme Courts. But I think, Justice Bowman, you have it correct. On the evidence itself, we believe that the record actually strongly supports the denial of the petition in a number of respects. First, we feel the regional board ignored the uncontested evidence on the primary detriment in this case, and that is the impact on the racial and socioeconomic aspects of education in the losing districts. There was much evidence, both stipulated and testimony, in the record concerning the impact based on the demographics of the four districts involved and of the territory that granted this detachment would have a substantial impact on racial balance in this particular area of DuPage County, as well as impact in the socioeconomic sense because of the value of the homes in the territory versus the other parts of both Glendale Heights District 15 and Glenbar District 87. In brief, the regional board concedes that this racial issue is relevant under the Joliet case, the Joliet 204 and Lincolnwood case. Another factor of significance is the fact the regional board did not address, in fact, relating to the distance from the territory to the elementary schools here. By granting the petition, the kids will travel a longer distance from the territory to the elementary schools in District 13, both at the K-5 and 6-7-8 level, than if we left the boundaries intact and they ultimately attended the District 15 schools. This racial and socioeconomic issue, you talked about it in terms of benefit detriment, but the five factors that we look at for benefit detriment don't seem to apply to that. This seems to apply more to the general educational welfare aspect, would it not? Do you see it applying to those five factors? I think that's where there's considerable overlap, Your Honor, in the sense that the testimony was elicited from our superintendents, from the district's perspective, but we educate those children that remain in both of our districts, and so the impact is the same. When we talk about the impact on the district, it is the impact on children that are in the existing districts now and attend schools in 15 and 87, and also the impact on kids who may attend schools from the detachment territory. So it's somewhat the same thing, in that we're talking about the same kind of analysis done by the Supreme Court in 1954 in Brown and all of the cases on desegregation that occurred thereafter. The issue is the school district and how it's aligned, but the impact is on the children. So you're finding that that's a substantial detriment? Or are you moving on to the other tests that you take a look at, the whole child and the community introspect? Is that where you're going? I think we have to look at that whole picture, Your Honor, but at least on the issue of whether there's detriment, we think there's substantial detriment, and there was testimony in the record on that issue. I'd like to get to those other points, if that's okay as well. On the economic side, which is more of a pure detriment to the district case, Justice Burke, I think the analysis of the regional board was this was a de minimis economic impact, but they failed to take into consideration the point made by this court in the Dresdner case that you have to look at whether the districts are levying at the maximum rate. In Dresdner, the court compared it to Gulf, where the districts were not levying at the maximum rate. Here, both districts are levying at the maximum rate, so I think their de minimis analysis, however you want to cut it, is not complete unless there's a consideration of whether the districts, as we're here, were levying at the maximum rate. They also disregarded... They also changed the percentages that they came up with in the board's ruling, though, correct? No, I think the percentages were based on statistical information that is pretty accurate. But we also had a disregard of the overall net loss to all four districts of tax revenue here, and that was not examined or considered by the regional board as well. The benefits claimed, and this goes to your question, Your Honor, about the whole child concept, everything that they relied on is laid out in three short paragraphs in their order, 17, 18, 19. I'd encourage you to look at those and see whether, as we contend, there's much substance there. In the first paragraph, 17, there are vague, unsubstantiated, not tied-to-the-record assertions about some school impact. This is not consistent with the court's analysis of impact in other cases. They introduced what we believe is an entirely new concept of how the whole child or community interest approach that originated in Gulf should be applied. They basically have said, and in a brief use of the term, neighborhood cohesiveness, as if one street and the dividing line which exists all over DuPage County is enough to constitute a community of interest without regard to whether there's a municipality or other school districts that a territory attached to. Your time is up, so finish your last slide. My only thought to finish, and I appreciate the time, Your Honor, is that in the Petropian case, this court made a specific reference to what is the connected territory in terms of another municipality and what is not. I think that analysis has not been applied here, and I encourage you to do that and to reverse on the merits. Thanks for your time this morning. Thank you. My name is Assistant State's Attorney Francis Cermak. On behalf of the attorneys, the regional board of school trustees, and the regional superintendent of schools. Mr. Cermak, can you start off by indicating how the board dealt with the socioeconomic detriment to the districts and racial detriment to the districts as far as diversity? As far as diversity goes, Your Honor? How did the board deal with it in the order? The board ruled in the order that there was no evidence of a negative racial impact, and the disloyal court agreed with the board's ruling that there was no evidence in the record of any kind of racial impact. Currently, there are no actual children attending the schools, and there was really no evidence of a detrimental racial impact. Well, if we're going to go on the basis of no children, why is this case even here? If we're going to go on the site, there would be no children going to the district. Why are we even engaged in this process? Well, Your Honor, there are school-aged children living in the territory, and there are... So we're talking about future children, which enables us to engage in this process. So if we're going to engage on your end, then let's engage on their end, too. I mean, if we're talking about future children, we're talking about future children from certain socioeconomic and racial divisions or whatever going to different schools. So, again, I'm just curious how the board dealt with that in the written order and what the trial court said about that specific aspect. The board dealt with it, Your Honor, in stating that there was no evidence. There was no evidence of what the race of the children living in the territory are. There were 17 children of school age living in the territory, and that... They all went to public or private schools, correct? That's correct, Judge. And that there was testimony that the parents would, if the petition was granted, they would sort of consider bringing or letting their children, sending their children to the public schools, and that the circuit court found that, yes, Judge Wheaton agreed with the board that there was no evidence here about any type of racial impact, and the court didn't really address the issue. Was there any evidence in your point that this is talking, as Justice Berks said, talking about future children? What is the evidence, and is it possible to establish how any non-existing student would benefit from a detachment? I guess there is no way to... Just that there are several school-age children living in the territory, and that whether or not there are children actually in the territory or not is not a requirement for a petition to be brought. Looking at it, going away from substantial detriment and talking about the whole child factor, the community of interest factor, other than Mr. Saviano's testimony, what testimony was there indicating that you could show some benefit to the educational welfare? The educational welfare pointed primarily to increasing the safety of students as they travel to and from school, which was a factor that the Supreme Court in the Gulf case relied upon in granting the petition there. Are you talking about transportation? I'm talking about the safety of the children traveling to and from school. There was testimony that the children, a child, Mrs. Girardi testified that shortly before the petition was brought, she had a child who had to walk down the Dinah Road, and that any children who would be going to the school, the public school, had to walk down the Dinah Road, which had no sidewalks and was very dangerous in the winter because it's only a two-lane road. Did the school district indicate that they could make a phone call and the busing could be changed? There was testimony to that point, Judge. Mrs. Girardi testified that she did contact the school, that the school rebuffed her, and then later moved the bus stop further away from where her children walked. There was rebuttal testimony by Dr. Messon in District 87, and the board ruled in its order that it weighed the credibility of Mrs. Girardi's testimony against the credibility of Dr. Messon's testimony and filed in favor of the testimony of Mrs. Girardi. The question of whether what is enough to grant a petition under the Educational Welfare Test, it can be very small, Judge. Courts have held that just a better tennis program is enough to grant a petition. That was Board of High School District 154 in McHenry County, a second district case in 1980. The Duckett case by the 4th District in 2003 said under Educational Welfare they can grant a petition just because the children want to participate in Girl Scouts and the 4-H Club with their friends down the street. But, again, you don't have any testimony or any evidence that any curricular activities of these children would be more beneficial in their area that they're in now or in the new district. There was no testimony with respect to that, was there? There was testimony, Judge. Mr. Saviano testified that this neighborhood is basically split in half north and south and that his children are friends with children 30 yards away from his home which attend a different school district. And he wants his children to attend the public school district and be able to go to the same district as his neighborhood. And he testified that currently the dividing line splits their community in half. And then there was the testimony of Mr. Saviano and Mrs. Girardi about improving the safety of the children traveling to and from school, which is a specification relied upon by the Supreme Court in the Gove case. That is enough to grant the petition here. There was an agreement that from the standpoint of educational quality there would be little difference between the different school districts. Is that true? That's correct, Judge. So let's talk about socioeconomic. Yes, Judge. What are the two primary socioeconomic issues that the Board relied on in making this decision? The Board found that under the stipulations there was no substantial detriment to either school. You basically have the benefit-detriment test or the educational welfare test. When there is no substantial detriment to the schools, when you look at the curriculum, financial impact, impact on the ability of the schools to meet state standards, then you start looking at educational welfare. Here, based on the stipulation and the testimony regarding the financial impact, the Board found that there was, under the stipulation, facilities were the same, curriculum were the same, no impact on the ability of the schools to meet state standards, and relied upon the School District 106, the Cook County Board of School Trustees in 1964 in the Bowman case, regarding the 2.5% rule of the financial impact. Here, the Regional Board found that the testimony showed we only had less than a 1% interest impact on the levy, with a $3 million surplus for District 15, and less than one-half of 1% on District 87, with a $12 million surplus. The Board found that this was a de minimis financial impact, not even reaching 1%. There was no substantial detriment, so the Board moved on to the educational welfare factors. You indicated that there was no evidence in the record, I believe that's what you said, regarding the racial issues involved here and the socioeconomic issues involved here. I mean, there was a complete breakdown in the stipulation, was there not? Regarding the racial, especially the racial aspect, not so much the socioeconomic, but the racial aspect of the different districts. Your Honor, I believe that the stipulation, or at least the financial impact of the Regional Board, did set forth what the racial dividing was, but there was no testimony as to what race the children are in this district, or that granting a petition one way or the other would disturb the patient. The petitioning area has 67.4% of white population. District 15 had 26.7% of white population. District 13 has 76.2%. So it seems like District 13 and the petitioning area are vast majority of the white population, whereas District 15, let's not read these things drawn from the stipulation, had 26%. And if the Board's, and I know that the Regional Office has certainly a priority on diversity and things of that nature, correct? I mean, it's a stated priority of the Board, correct? Yes, Judge. So I'm looking at this, and I'm weighing it against one bus stop being moved. Miss, that's what you're telling me. What I'm hearing is that this thing was, this whole thing was moved because of one bus stop, and the credibility determination the Board made regarding this bus stop. Is that what I'm hearing? No, Judge. The petition was granted because the Board found the testimony compelling to unite the neighborhood of this north-south street being divided north in half, and also to improve the safety of children traveling to and from school so that they would not have to travel down the road, and also to decrease, if there was, if it was granted that children were going to public school, there would be half the number of buses present. Uniting a neighborhood, okay, where is that in the case law regarding that this Court should say, yes, it's a great idea to unite the neighborhood, unless there's some evidence showing community of interest, meaning that the neighborhood is affiliated with that district. Here we have a neighborhood, 75 percent is affiliated with one district, 25 percent wants the 75 percent to go to the 25 percent. So if we're talking about affiliating in a district where none of the kids go to the schools, so, I mean, when we're talking about community of interest, we're looking at, at least the way I read the cases, is what's the affiliation of this community of interest with that district that they're going to? Not uniting a neighborhood in general, and maybe I'm misreading it, you tell me, Kevin. Well, Judge, Mr. Sagao testified that all the members of that block divided by the school districts are part of the same park district, but none of these children go to the same school, they can't go to the same school. But there's also evidence that the park district is affiliated with the district that they're reading. Right. Well, Judge, even if Your Honor does not find that that is sufficient, the park district issue of the uniting neighborhood, which is a community of interest factor, it is enough for this court to rely upon the improved traffic safety, an improved safety of the children traveling under the golf case. Again, I apologize, I used up all of Mr. Stull's time. No, you didn't. Oh, I do not, okay. That should be brief. Oh, okay. Thank you, Your Honor. You have ten minutes. If Your Honor has any other questions, I'd ask that you affirm the decision that Region 4 school trustees and the lower court. Thank you. You can divide the rebuttal. You have five minutes to divide it however you wish. Let's not rebuttal yet. I think Mr. Stull has five minutes. You still have ten minutes. Is that correct? I have five minutes, Your Honor. Five minutes. Good morning, Your Honor. My name is Christopher Stull. I represent the petitioning committee of ten. My clients were the actual petitioners who filed the petition before the regional board. The only two points that I wish to make by way of presentation are this. Number one, we believe that there is an additional factor that has not been discussed here this morning. It is not a dispositive factor, but it is certainly one of the factors that should be considered, which is the wishes and desires of the parents that filed the petition. It was the clearly expressed will of the overwhelming majority of the residents of the petitioning territory that this petition be granted. By law, we couldn't even have filed the petition unless we had two-thirds of the registered voters sign the petition for annexation and detachment. We exceeded that number. So are you saying that any neighborhood that decides they want to go to a different school, if they all band together and get enough petitioners, they're in? No, Your Honor, but they must obtain the signature assent of two-thirds of the registered voters of any petitioning territory before the petition can even be considered. If you use the route of filing the petition. But you still have to go through the same. You have all your petitioners. Everybody signed. Everybody wants to go forward. Where's the substantial detriment? I'm sorry. The substantial detriment to who? The districts that they intend to leave or the districts that they or the neighborhood children because of the detachment? The substantial detriment to the districts and then go on to the whole child factor and the community of interest factor. The same way as your partner did. I grant you everybody wants to leave the district. They're fleeing like rats from a sinking ship. I don't doubt that. But tell me how it is that anybody can venue shop, if you will, for a school. Well, we don't believe that the venue shopping is necessarily appropriate. But in a situation where a neighborhood is surrounded on three sides by the territory of another district and where a portion of the neighborhood is already in that other district so that you are literally surrounded by territory of the district that you're seeking to join, that it doesn't necessarily constitute for a shopping. We do believe that there is no substantial detriment to the districts that we are leaving. We're unable to identify any substantial detriment to districts 1587. How about a tax impact? There is always going to be a tax impact. If that is merely the question, whether or not there's a tax impact, then no petition for annexation and attachment could ever be granted because there is always going to be a tax impact when such a petition is granted. The question is whether or not the granting of the petition would cause the districts who are leaving to fail to attain the state standards of recognition for financial purposes. There was absolutely no testimony induced during the hearing introduced by the districts or anyone else to show that the granting of this petition would cause them to fail to attain the state standards of financial recognition as those standards are stipulated and set forth by the State Board of Education. In fact, the impact would be de minimis to them, but was extremely small. Let me ask you this. Was there any evidence to suggest that any child in the territory identifies with either District 13 or 108? Other than Mr. Saviano's testimony, was there any other evidence to suggest that the children identify, i.e., Girl Scouts, Boy Scouts, sports activities? Was there any evidence? Actual direct testimony, no, Your Honor, and there could not be. It would have been speculative at best. Because why? Because there were none of the children that are in the detachment territory do not attend District 13 and 108. So they cannot testify that they would be deprived of a particular program because they are not in those programs. They are in whatever programs are offered by 15 and 87. What I will say is that the testimony of Mr. Saviano indicated that by joining the districts they sought to enter, which were 108 and 13, their children would then be able to participate fully in the extracurricular programs and outside activities that are school-based within that district. If they went to those schools? If they went to those schools, yes. We do believe that Mr. Saviano also alluded to the fact that he knew that certain programs are school-based, such as school extracurricular sports, such as scouting programs. If the children aren't in those districts, they cannot participate in those programs. And that was one of the motivating factors that led to the filing of the petition to preserve the continuity of the community. Because the thought was on the part of the petitioners that their children were being discriminated against in the sense that they were not allowed to participate in the same types of activities as children that lived a few yards away within a relatively isolated neighborhood that has one way in and one way out. Well, what do you mean they were not allowed if they went to the schools? I mean, there's nobody being deprived of anything at this moment because they're not going to those schools. That is correct. If they were in the schools, they would be able to participate. If they were in the public schools in the other school, then they wouldn't be able to participate in the school that you want to go to. I understand that. But right now, there's no evidence of any of that because, again, I don't know if you'd call it speculation or reasonable inferences. We can parse those words, I guess. Isn't the whole entire territory located within the Bloomingdale Park District? I believe— It's located within the same park district, the same library district, right? Yes, it is. It is. It is located within the same library district and within the same park district and the same municipality, all within the U-Village of Bloomingdale. I believe your time is up. Thank you, Your Honors. At this point in time, I'll go back. There'll be rebuttal argument at this time. Very briefly, Your Honor. I will waive my time from the risk of having to handle all of this. All right. I appreciate the court's indulgence. Just briefly, the evidence on the race material was part of the record in terms of the introduction of the school report cards where all of this data is laid out. That's there. But there's also considerable testimony by both superintendents from 15 and 87 as to what that means when these numbers are changed around. I encourage the court to review that testimony. As far as the kids, no kids scenario, and I think, Justice Burke, you made the point, but I'd also refer the court to the Pontiac case where there were no kids there either because there's a new subdivision. But the court said you've got to show what educational benefit is going to flow to the kids that will be there in the immediate future. None of that is in this record here. And I think Pontiac is a closer justification for the fact that this decision is simply not supported. Please discuss the safety issue because that's certainly a concern to everybody. The safety issue, insofar as it relates to transportation, Your Honor, we think is a fabricated issue here. The lady that testified never went past a secretary at District 87, never made a request for the bus stop to be changed. That's in the record. She acknowledged that on cross-examination. That is it. Both superintendents testified that they make their entire busing decisions based on safety issues. Likely, if kids come out of the territory to District 15 or 87, the buses would go directly into that subdivision. The speculation the regional board engaged in about too many buses, there was no testimony on that, how many buses go through there now, how many buses would have to go through there, whether this would create any traffic. There's nothing but speculation on that issue. There's nothing in this record that suggests that granting this detachment will improve school safety in any respect, particularly transportation. I mean, it's a reasonable inference if you have two districts sending their buses into the same subdivision, there's going to be twice as many buses in the subdivision. But there's no evidence. That's speculation. That's a reasonable inference. The other part of this territory, if you will, that they want to attach to, the other part of the neighborhood, is nine lots. There's no evidence where those kids, or if there are any kids in there at all, there's no evidence where they go to school or if they're on a bus or anything like that that would create that kind of a potential hazard. Where's the evidence that the board relied upon regarding the bus stops being farther away, I think is what one of the issues was. Not necessarily the one on the street, but there were three things. There was the buses going through the, you know, increased bus traffic in the subdivision. There was the bus stop on Medina Road. Yes. And there was also some issue raised by the board, I think, in their findings about walking farther to a bus stop. Well, I guess they presumed that we would put the bus stops on Medina Road, which is completely... What evidence was there in the record of where the bus stops are, where they will be, where they will not be? Well, the testimony of the two superintendents from 15 and 87 was that depending on how many kids there were, it's likely that there would be at least one, probably two bus stops even within these two small subdivisions. That was the testimony in the record. That was the expert testimony. There was no testimony at all from the petitioners on that issue. Mr. Stahl, there's always, as counsel indicated, there's always going to be tax impacts, tax consequences when you have somebody petitioning for detachment. That's correct, Your Honor. I would agree with that statement. The problem is when you're doing the Carver analysis and you're analyzing the detriment, the benefit and the detriment, which I think is where you were going in some of those questions, you've got a scale of justice there that has to be added to on both sides. This is a factor here. It's a bigger factor under the decisions in this district because the districts are at the maximum rate. We don't think that was looked at correctly in that respect. Is it the overriding factor? It may not be. But when you put that on top of the longer distance to elementary school, which is always a factor, and then you add the significant racial and socioeconomic issues, that weight on the detriment side is fairly substantial. When you talk about longer distances, though, we're talking about, was it one, we talked about two-tenths of a mile for one group of kids, the younger kids, and three-tenths of a mile for the older kids? I think that's in the ballpark. It may be two and four-tenths, Your Honor. But this is transportation of very young children, pre-K and up. Every day, 176 days a year, it's additional bus time as two-tenths of a mile substantial. And let's weigh that in terms of the, certainly the high school can't argue that because it's shorter than the high schools. I think that's correct. 1.6 miles shorter to 9-10 and 2.7 miles shorter to 11-12. I understand older kids can be on a bus longer than little kids. I understand that.  Well, I think the testimony, which was unrebutted by the superintendent of District 15, suggested that there is an impact. How that is measured on a particular kid over the course of many years of attending a K-5 building, hard to gauge. But the courts have said shorter is better. And here, we don't have that in favor of the detachment order. Certainly at the K-8 level, we don't have that. It's a negative. Hard to gauge how big of a negative it would be. I guess you have to look at individual kids and how they handle bus rides every day for the whole school year. Thank you. Just one question. Oh, I'm sorry. Was there any testimony from Mr. Saviano or otherwise that these individuals who are petitioning would in fact send their kids to public school should this detachment occur? He said he would consider. He alone would consider. He didn't say he would do it. He just said he would consider. And there was no testimony from anyone else, any of the other parents? Nobody. Thank you, ma'am. Case is taken under advisement.